# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIM. NO.: 1:10-cr-00011 |
| v. | ) | |
| | ) | |
| JIMMY DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Finch, Senior Judge

### I.    Introduction

THIS MATTER comes before the Court on Defendant Jimmy Davis's Motion to Suppress.  Defendant seeks to suppress statements that he made to police following his arrest on the grounds that they are the product of coercion and were thus obtained in violation of his *Miranda* rights.  The Government contends that Defendant's statements were not made during an interrogation and are therefore not subject to the *Miranda* analysis.  This Court held an evidentiary hearing on this matter on June 8, 2010.  Because this Court finds that the statements were not made as the result of an interrogation, Defendant's motion is DENIED.

### II.    Background

At about 5:45 A.M on February 13, 2010, officers of the Virgin Islands Police Department ("VIPD") executed a search warrant of No. 816 Williams Delight in Frederiksted,

St. Croix.[1]  During the execution of this search warrant, a member of the VIPD witnessed what appeared to be a hand grenade being tossed from the living room window of the house.  The search of the residence also revealed a handgun.  Defendant Jimmy Davis and his mother were the only occupants of the home at the time of the search.  Detectives Jose Silva and Richard Mathews arrived on the scene as the search was concluded.  Detective Silva was informed by other VIPD members that a handgun had been found at the residence and that a grenade had been thrown from the window of the home.   Defendant was arrested and placed in the custody of detectives Silva and Mathews, who transported him to the Frederiksted Police Station located at 45 Mars Hill.

At the Frederiksted Police Station, Detective Silva brought Defendant to a communal office.  This office was shared by several detectives including Silva, Mathews, and Sergeant Ishamael Ramirez.   The office was approximately 380 square feet and contained five workstations.  (See Govt's Ex. 1, Office Diagram.)  Defendant was seated in a chair near Detective Silva's desk.   Detective Silva produced a "Warning and Consent Form" and immediately began reading Defendant his *Miranda* rights from that form.[2]  Defendant was given a copy of the form and asked to read along aloud with Silva.   After Detective Silva read Defendant his *Miranda* rights, he asked Defendant if he understood his rights.   Defendant verbally acknowledged that he understood.  Detective Silva then asked Defendant to sign the

---

[1] These facts are based on testimony given by Detective Jose Silva and Sergeant Ishamael Ramirez at the June 8, 2010 hearing on Defendant's Motion to Suppress.

[2] Both Detective Silva and Sergeant Ramirez testified that they were aware that Davis had been arrested 23-24 times.  Detective Silva testified that he had personally arrested Davis 7 times and that he always refused to make a statement following his arrest.

form indicating that he understood his rights. Defendant refused to sign. Detective Silva testified that Defendant declined to speak about the case.

Shortly after mirandizing Defendant but before he could begin "processing" him, Detective Silva received a call from Sergeant Ramirez requesting that he proceed immediately to the Lorraine Village area to assist in the execution of a search warrant for Defendant's girlfriend's residence.[3] Detective Silva took Defendant and placed him in a holding cell at the Frederiksted Police Station. Detective Silva then traveled to the Lorraine Village area, discovered that the search had been completed and that his assistance was no longer required, and returned to the Frederiksted Police Station. The trip to Lorraine Village and back to the police station took approximately 30 minutes.

Upon returning to the Frederiksted Police Station, Detective Silva brought Defendant from the holding cell back to the communal office. There, detectives Silva and Mathews began "processing" Defendant and filling out arrest forms with Defendant's biographical data, including his name, address, birth date, social security number, employment and other information. Detective Silva testified that, during the filling out of these forms, Defendant attempted to engage in conversation unrelated to the case, including a question about the current status of a case involving one of Davis' ex-girlfriends. Detective Silva testified that he declined to participate. At some point during this "processing" period, Defendant's handcuffs were removed.

---

[3] Detective Silva testified that he received the call approximately 2-3 minutes after he first brought Defendant into the communal office.

Shortly after this second attempt at processing Defendant began, Sergeant Ramirez, who had been supervising the search of Defendant's girlfriend's residence at Lorraine Village, and officers Kenneth Edwards and Naomi Joseph entered the communal office. At about the same time, Detective Mathews left. Sergeant Ramirez testified that when he entered the room, Defendant appeared relaxed and was engaged in "general conversation" with Silva and Mathews about his girlfriend and other cases involving Defendant. Detective Silva informed Sergeant Ramirez that Defendant had been mirandized and that he refused to talk about the case.

Shortly after Sergeant Ramirez entered the communal office, he told Defendant that police had seen Defendant and his girlfriend out the night before. Defendant responded that it was not him whom police saw and then proclaimed that his girlfriend had sex with another individual in exchange for $1,000. Sergeant Ramirez then turned to Detective Silva and, in the presence of the Defendant, asked him if Defendant had said anything about the firearm found at 816 Williams Delight. Detective Silva responded that Defendant had not said anything. Sergeant Ramirez then asked how many people were found at 816 Williams Delight during the search. Detective Silva responded that two people were found – Defendant and Defendant's mother. Detective Ramirez then asked why Defendant's mother had not been questioned.[4] Detective Silva responded that she had been upset by the search. Sergeant Ramirez then suggested that Detective Silva question Defendant's mother about the firearm. Defendant immediately stated that the firearm belonged to him and that the grenade was not a functioning grenade and could be purchased anywhere.

---

[4] During the hearing, Sergeant Ramirez explained that when police search a residence and find a firearm, whose ownership is not immediately apparent, they normally question everyone found at the residence regarding the firearm.

## III.  Discussion

Defendant contends that the statements regarding the firearm and grenade must be suppressed because "they were taken in violation of Davis' Miranda rights in that the statements were coerced out of Davis after he unequivocally exercised his right to remain silent."  (Def.'s Mot. at 1.)  At the hearing, Defendant argued that police tricked him into making the statement by using "psychological warfare" and that he "never stood a chance."  The Government argues that Defendant's statement was a spontaneous confession and was made voluntarily without police coercion.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. at 444; *see also United States v. Calisto*, 838 F.2d 711, 716 (3d Cir. 1988) ("Under the prophylactic rules announced in *Miranda v. Arizona*, a statement made by a suspect in response to custodial interrogation after he or she has elected to remain silent is inadmissible at trial.").  However, in order to invoke *Miranda*'s exclusionary rule, the statement must have been obtained during a custodial interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980); *United States v. Mesa*, 638 F.2d 582, 584 (3d Cir. 1980) ("*Miranda* warnings are designed to protect against the evils of "custodial interrogation," and they are not intended to unduly interfere with a proper system of law enforcement or to hamper the police's traditional investigatory functions."). Statements made outside of a custodial interrogation do not implicate a defendant's Fifth Amendment right to

avoid self-incrimination and are therefore not subject to exclusion under *Miranda*.    *Innis,* 446 U.S. at 300.

The phrase "custodial interrogation" refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Innis*, 446 U.S. at  299 (citing *Miranda*, 384 U.S. at 444).  However, the *Miranda* rule also "comes into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Brownlee*, 454 F.3d 131, 146 (3d Cir. 2006) (quoting *Innis*, 446 U.S. at 300-01).  Thus, before the Court reaches the question of whether Defendant's statements were a knowing and voluntary waiver of his *Miranda* rights, the Court must first determine whether the statements were made during a "custodial interrogation" and hence whether *Miranda* even applies.

Here, the evidence is clear that Defendant's statements concerning the firearm and grenade were not a response to "express questioning."  While it appears that Sergeant Ramirez did, at one point, speak directly to Defendant and inform him that police saw he and his girlfriend out the night before, the statements that Defendant seeks to suppress was made by him following an exchange between Detective Silva and Sergeant Ramirez.  Thus, to succeed on his *Miranda* claim, Defendant must show[5] that the police should have known that their words and

---

[5] *See United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir.1989) (defendant has burden to establish that he was subject to custodial interrogation); *United States v. Charles*, 738 F.2d 686,

actions were "reasonably likely to elicit an incriminating response from the suspect." *Brownlee*, 454 F.3d at 146.

To determine whether a Defendant's statement was made during an "interrogation," courts are instructed to focus "primarily upon the perceptions of the suspect, rather than the intent of the police." *Innis,* 446 U.S. at 301. Relevant factors include any knowledge the police have concerning "the unusual susceptibility of a defendant to a particular form of persuasion," (*Brownlee*, 454 F.3d at 147) whether the police's precipitating remark was the "kind of remark than an officer would normally make in the carrying out his duties under the circumstances that confronted him," or whether the police's remark was "made in a provocative manner." *Calisto*, 838 F.2d at 718. The intent of the police may also be relevant, "particularly when a police practice is designed to elicit an incriminating response." *Brownlee*, 454 F.3d at 147 (quoting *Innis*, 446 U.S. at 301). "Police may not, however, be held accountable for the unforeseeable results of their words or actions, and to constitute an interrogation their conduct must reflect a measure of compulsion above and beyond that inherent in custody itself.*" Id.* at 146 (internal citation and quotations omitted) (quoting *Innis,* 446 U.S. at 300, 302).

In this case, the Third Circuit's *Calisto* opinion is instructive, if not dispositive. While executing a search warrant of a residence where Calisto and his daughter resided, police found a suitcase of methamphetamine in an upstairs bedroom. *Calisto*, 838 F.2d at 713. Upon finding

---

692 (5th Cir. 1984) (holding that on motion to suppress statements allegedly obtained in violation of *Miranda* warnings, "the defendants' burden required that at a minimum they demonstrate that the . . . statements were obtained while they were under custodial interrogation.") abrogated on other grounds as recognized in *United States v. Crawford*, 52 F.3d 1303, 1307 n.4, (5th Cir. 1995).

the drugs, Officer McKeefry of the Philadelphia Police Department arrested Calisto and read him his *Miranda* rights.[6] Calisto stated that he wished to remain silent. *Id.* A moment later, another officer reported "that he had found both men's and women's clothing in the bedroom where the methamphetamine had been located." *Id.* Officer McKeefry responded "Well, then we'll have to get an arrest warrant for the daughter." *Id.* Calisto then said "Don't lock my daughter up. She has nothing to do with that stuff. That's mine. I'm the one you want." *Id.* Calisto moved to suppress the statement on the grounds that it was obtained during a custodial interrogation after he had asserted his right to remain silent.

The Eastern District of Pennsylvania denied the motion to suppress finding that the statement was a "blurt-out" not made "in response to any interrogation by the police." *Id.* at 717. Relying on *Innis*, the Third Circuit affirmed finding that:

> McKeefry's remark regarding the possible arrest of Calisto's daughter was not directed to Calisto, was the kind of remark that an officer would normally make in carrying out his duties under the circumstances that confronted him, and was not made in a provocative manner. Moreover, it was a single isolated remark made in the presence of a suspect who showed no signs of being emotionally upset or overwrought. Finally, even if it could be said that reasonable officers might have expected a protest of some kind from Calisto upon his hearing of his daughter's possible arrest, we do not think it was reasonable to expect an inculpatory response from Calisto.

*Id.* at 718.

The Court views this case very similar to *Calisto* and reaches the same conclusion. The remark that precipitated the statements that Defendant seeks to suppress was not directed at Defendant; rather, Defendant's statements followed a brief conversation between Sergeant

---

[6] The police had also read Calisto his *Miranda* rights "at the outset of the search." *Id.*

Ramirez and Detective Silva concerning the questioning of Defendant's mother.[7] *See Innis*, 446 U.S. at 303 (finding statements made by defendant in police car following brief conversation between police officers not the product of an interrogation because "[t]his is not a case where the police carried on a lengthy harangue in the presence of the suspect."). Furthermore, Sergeant Ramirez's remark was the kind of remark that a police officer would ordinarily make during an investigation of a firearm whose ownership was in question and was not "provocative." Detective Silva had just informed Sergeant Ramirez that only Defendant and his mother were found at 816 Williams Delight. It was reasonable and in line with routine police investigation (according to Sergeant Ramirez's testimony) for Ramirez to direct Officer Silva to interview the only other apparent occupant of the home regarding the ownership of the firearm.[8] Furthermore, Davis showed no signs of "being emotionally upset or overwrought." To the contrary, Detective Silva and Sergeant Ramirez testified that the atmosphere was relaxed and that Davis, who at this point was not hand-cuffed, appeared at ease. Both were aware that Davis had been arrested at least 23 times and frequently, if not always, refused to answer questions about a case. *See United States v. Kime*, 99 F.3d 870, 880 (8th Cir. 1996) (finding fact that defendant was a "veteran of the criminal justice system who understood fully the scope of the rights he was waiving" weighed in favor of voluntariness of confession). Thus, it cannot be said that Sergeant Ramirez and Detective Silva should have known that their discussion regarding questioning Defendant's

---

[7] The Court acknowledges that Sergeant Ramirez's statement to Defendant that police had seen him and his girlfriend out together the night before might be close to an "interrogation." However, the record is clear that this statement is not what precipitated Defendant's statements concerning the firearm and grenade.

[8] Neither Detective Silva nor Sergeant Ramirez ever threatened to arrest Defendant's mother. Factually correct statements to Defendants about normal police procedures are not threats. *See, e.g., United States v. Abfalter*, 340 F.3d 646 (8th Cir. 2003) (finding that police statements to Defendant that her children would be placed in foster care were not threats).

mother was "reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300-01; *Brownlee*, 454 F.3d at 146.

**IV.**     **Conclusion**

The Court finds that the Defendant's statements concerning the firearm and grenade found at 816 Williams Delight were not made during a custodial interrogation and therefore not obtained violation of  Defendant's *Miranda* rights.  Accordingly, it hereby

**ORDERED** that Defendants' Motion to Suppress is **DENIED**.

**ENTERED this 10th day of June, 2010**.

_____/s/_____
HONORABLE RAYMOND L. FINCH
SENIOR U.S. DISTRICT JUDGE